**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SOUTHWESTERN BELL TELEPHONE | ) | |
| COMPANY, *et al.* | ) | |
| | ) | |
|    Plaintiffs, | ) | |
| | ) | |
|       v. | ) | |
| | ) | Civil Action No. 3-10-cv-01642-P |
| TOUCH-TEL USA, LLC, | ) | |
| | ) | |
|    Defendant. | ) | |
| | ) | |
| | ) | |

**REPLY BRIEF IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

**(REDACTED)**

Richard M. Parr, Bar No. 15534250
Timothy A. Whitley, Bar No. 00797660
AT&T Services, Inc.
208 S. Akard
Suite 2900
Dallas, Texas 75202
Telephone (214) 757-3386
Facsimile  (214) 748-1660

Theodore A. Livingston (*pro hac vice*)
Demetrios G. Metropoulos (*pro hac vice*)
Michael T. Sullivan (*pro hac vice*)
Robert E. Entwisle (*pro hac vice*)
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 782-0600
Facsimile (312)  701-7711

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page(s)

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT ........................................................................................................................ 4

    I.    As The Court Correctly Held In The IDT Case, There Is No Genuine
Dispute As To Any Material Fact Regarding Touch-Tel's Liability For
Access Charges ...................................................................................................... 4

        A.    This Court Was Right When It Held That The FCC's 2006 Order
Requires All Prepaid Calling Card Service Providers To Pay
Access Charges ........................................................................................... 4

            1.    The FCC's Order Went Beyond The Two Specific Services
Mentioned In The First Three Sentences Of Paragraph 1 ............... 5

            2.    Touch-Tel Reads Paragraph 27 Of The FCC's Order Out
Of Context ...................................................................................... 6

            3.    Touch-Tel Cannot Use "Industry Standards" To Overturn
This Court's Ruling Or The FCC's Order ...................................... 8

        B.    The Telecommunications Act Of 1996 Did Not Destroy, But
Instead Preserved, Access Charges On The Long-Distance Calls At
Issue Here ................................................................................................... 9

        C.    As The Court Held In The IDT Case, Touch-Tel Has Also Violated
The AT&T LECs' Binding Federal Tariffs ............................................. 12

            1.    Contrary To Touch-Tel's Assertion, The Court Did
Analyze The Relevant Tariffs In The IDT Case. ........................ 12

            2.    Touch-Tel Has Obtained – But Not Paid For – Originating
"Switched Access Service" As Defined By The AT&T
LECs' Tariffs ............................................................................. 13

            3.    As In The IDT Case, The Court Should Reject Touch-Tel's
Baseless "Feature Group" Argument ........................................... 17

        D.    There Is No Genuine Dispute That Touch-Tel Has Constructively
Ordered Access Services From The AT&T LECs. ................................... 19

    II.    The Court Should Disregard Touch-Tel's Untimely And Baseless
Attempts To Seek Summary Judgment On Damages Issues .............................. 21

    A.    The AT&T LECs Are Entitled To Collect Damages From January 2007
Through August 2008 .......................................................................................... 21

    B.    To Be Made Whole, The AT&T LECs Are Entitled To Receive Interest
For The Time Touch-Tel Deprived Them Of Their Tariffed Access
Charges ............................................................................................................... 22

i

# TABLE OF CONTENTS

**Page(s)**

III.     The AT&T LECs Are Entitled To An Injunction Enforcing Their Tariffs
And The FCC's Orders And Rules ...................................................................... 23

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

CASES

*3 Rivers Tel. Coop. v. US West Communications, Inc.*,
 45 Fed. Appx. 698 (9th Cir. 2002) ..................................................................................12

*Alliance Communications Coop. v. Global Crossing Telecommunications, Inc.*,
 690 F. Supp. 2d 889 (D.S.D. 2010) ................................................................................17

*Alliance Communications Coop. v. Global Crossing Telecommunications, Inc.*,
 663 F. Supp. 2d 807 (D.S.D. 2010) ................................................................................20

*Beattie v. CenturyTel, Inc.*,
 673 F. Supp. 2d 553 (E.D. Mich. 2009)..........................................................................21

*In re Connect America Fund*,
 26 FCC Rcd. 4554 (Notice of Proposed Rulemaking, rel. Feb. 9, 2011) ......................23

*Louisiana & A. Ry. v. Export Drum Co.*,
 359 F.2d 311 (5th Cir. 1966) ..........................................................................................22

*MCI WorldCom Network Services, Inc. v. Paetec Communications, Inc.*,
 2005 WL 2145499 (E.D. Va. Aug. 31, 2005)..................................................................17

*Shepherd v. Comptroller of Public Accounts*,
 168 F.3d 871 (5th Cir. 1999) ..........................................................................................13

*Southwestern Bell Tel. Co. v. FCC*,
 153 F.3d 523 (8th Cir. 1998) ............................................................................................9

*WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc.*,
 2005 WL 2145499 (E.D. Va. Aug. 31, 2005)..................................................................17

*WorldCom v. FCC*,
 288 F.3d 429 (D.C. Cir. 2002) ..........................................................................................8

STATUTES

47 U.S.C. § 153..........................................................................................................................10

47 U.S.C. § 251(a)(1).................................................................................................................19

47 U.S.C. § 251(g) ...........................................................................................................9, 10, 11

47 U.S.C. § 415(a) .....................................................................................................................21

Telecommunications Act Of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) ...........................9

## FCC ORDERS

*AT&T Corp. v. YMax Communications Corp.*,
   26 FCC Rcd. 5742 (2011) .................................................................................................17

*In re Access Charge Reform: Reform of Access Charges Imposed by Competitive Local
   Exchange Carriers*, 19 FCC Rcd. 9108 (2004) ...............................................................11, 16

*In re Amendment of Part 69 of the Commission's Rules to Ensure Application of Access
   Charges to All Interstate Toll Traffic*, 102 FCC 2d 1243 (1985) ...................................... 10-11

*In re AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling
   Card Services,* 20 FCC Rcd. 4826 (2005) ("*2005 Calling Card Order*") ..................6, 8, 9, 23

*In re Petition of WorldCom, Inc.*,
   17 FCC Rcd. 27039 (2002) .............................................................................................11

*In re Regulation of Prepaid Calling Card Services*,
   21 FCC Rcd. 7290 (2006) ("*Comprehensive Calling Card Order*")..................................... 4-7

*In re-Touch-Tel USA, LLC,*
   26 FCC Rcd. 12836 (2011) *("Touch-Tel Forfeiture Order I")*..................................................3,

*Southwestern Bell Tel. Co. v. IDT Telecom, Inc.*, Case No. 3-09-cv-01268-P
   (March 9, 2012) *("IDT Summary Judgment Order")* ..................................................... *passim*

*Starpower Commc'ns v. Verizon South*,
   18 FCC Rcd. 23625 (2003)...............................................................................................8

*United Artists Payphone Corp. v. New York Tel. Co.*,
   8 FCC Rcd. 5563 (1993).................................................................................................19

## OTHER AUTHORITIES

47 C.F.R. § 69.2(b) ...........................................................................................................15

47 C.F.R. § 69.5(b) .......................................................................................................15, 24

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court "resolved the issues of liability" presented here, in the similar case Plaintiffs brought against IDT. March 15, 2012 Order (Dkt. No. 47) at 1. After exhaustive briefing, the Court issued a 17-page opinion, in which it squarely held that "prepaid calling card providers who utilize LANs" – local access numbers – "are responsible for access charges" to Plaintiffs. March 9, 2012 Order (Dkt. No. 124), in *Southwestern Bell Tel. Co. v. IDT Telecom, Inc.*, Case No. 3-09-cv-01268-P ("*IDT Summary Judgment Order*") at 11; Pl. Appx. 178.

The Court has also correctly appreciated "that similar issues are before the Court in this case." March 15, 2012 Order (Dkt. No. 47) at 1. The defendant here, Touch-Tel, is indisputably a "prepaid calling card provider." It indisputably "utilize[s] LANs." Thus, like IDT, Touch-Tel is "responsible for access charges" on prepaid long-distance calls that its cardholders originate from Plaintiffs' networks. Plaintiffs, the AT&T local exchange carriers ("AT&T LECs"), have accordingly asked the Court to enter the same award of partial summary judgment on liability that this Court has already entered against IDT, and the same injunction that this Court pledged it would enter at the conclusion of the upcoming IDT trial.

The AT&T LECs' opening brief confirms that there are no distinctions between IDT and Touch-Tel, and Touch-Tel's response brief does not even claim that there are any distinctions. There is no dispute that so long as the Court follows its own ruling in the IDT case, the AT&T LECs are also entitled to partial summary judgment and injunctive relief here. Touch-Tel's arguments are identical to arguments the Court heard from IDT and rejected, to the point that Touch-Tel appends copies of IDT's briefs and tries to "incorporate" IDT's arguments. Touch-Tel acknowledges (at 4) that its arguments are presented solely (i) in the hope this Court might do an about-face and reconsider the 17-page ruling it entered just two months ago in the IDT case and (ii) to preserve its arguments for a possible appeal.

As confirmed below, the Court was right to reject these arguments when IDT presented them, and Touch-Tel's reruns fare no better the second time around. Touch-Tel offers no new arguments, no new law, and no new facts.  The Court's ruling in the IDT case is correct, and the Court should now apply that same ruling to the same facts here – a result Touch-Tel invited when it asked the Court to defer proceedings here until after the ruling in the IDT case.

Before proceeding, however, two points warrant emphasis. **First,** although Touch-Tel grudgingly "acknowledges that the Court disagreed with at least some of IDT's legal arguments" (Def. Br. 2) most of its brief reads as if the Court never ruled or even heard about these issues. For example, right after acknowledging this Court's decision, Touch-Tel (*id.*) accuses the AT&T LECs of "stretching the language" of the FCC's 2006 order on prepaid calling card services into a "contorted interpretation" based on "selectively quoted language." Touch-Tel's rhetorical blasts overlook the fact that this Court (and Judge O'Connor of this District) have both read the FCC's order and agreed with the AT&T LECs that the order plainly extends to "all" prepaid calling card service providers, including those that use LANs. Pl. Br. 9-12. Thus, the AT&T LECs' motion is not based on "what Plaintiffs claim" the FCC said (Def. Br. 2), but on what *this Court held, in a 17-page opinion*. Touch-Tel may disagree with the Court's ruling, but inflammatory invective (nominally directed at the AT&T LECs, but in effect targeted at the Court) is hardly a respectful way to seek the Court's reconsideration.

It is particularly disingenuous for Touch-Tel of all parties to challenge this Court's construction of the FCC order, because before this lawsuit began Touch-Tel itself *agreed* with the Court's reading. As the AT&T LECs showed in their opening brief, when Touch-Tel obtained LANs from Time Warner it signed a contract in which Touch-Tel expressly

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

in that very same FCC order. Pl. Appx. 1 (fifth paragraph). Touch-Tel now claims that its signed admission is "irrelevant," an argument it tries to bury on page 42 of its brief. Touch-Tel baldly asserts – with no supporting citation, contractual analysis or evidentiary support – that the contract was not talking about LANs. Touch-Tel offers no support for this assertion, because there is none. Touch-Tel's Rule 30(b)(6) witness acknowledged that the contract ██████████ ██████████████████████. Pl. Reply Appx. 11. And Time Warner twice admonished Touch-Tel that █████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ Pl. Reply Appx. 13-16.

**Second,** Touch-Tel repeatedly suggests that it should be excused from paying access charges because it is a "small company" that provides "inexpensive" service to "low income and/or immigrant populations." *E.g.* Def. Br. 5. Touch-Tel is no Robin Hood. The FCC recently sanctioned Touch-Tel for misleading its low-income and immigrant customers and gouging them with hidden fees. *In re-Touch-Tel USA, LLC*, 26 FCC Rcd. 12836 (2011) ("*Touch-Tel Forfeiture Order I*"). Touch-Tel's attempt to play the "little guy" is equally baseless; Touch-Tel is in fact one of the largest long-distance providers in the country. Pl. Reply Appx. 4.  More fundamentally, Touch-Tel's argument is irrelevant: as this Court has held, the FCC's order requires *all* prepaid calling card service providers to pay access charges, and all companies (big or small) must obey the law.

If Touch-Tel is trying to suggest that it cannot pay a judgment, it should have said so before asking the Court to delay the trial while the AT&T LECs' damages continue to mount. One reason why the Court postponed trial was that it assumed Touch-Tel could compensate the AT&T LECs for the delay through the damages award. March 15, 2012 Order (Dkt. No. 47) at 1. If that assumption was incorrect, Touch-Tel should have advised the Court and AT&T LECs.

**ARGUMENT**

**I.      As The Court Correctly Held In The IDT Case, There Is No Genuine Dispute As To Any Material Fact Regarding Touch-Tel's Liability For Access Charges.**

**A.      This Court Was Right When It Held That The FCC's 2006 Order Requires All Prepaid Calling Card Service Providers To Pay Access Charges.**

The Court is quite familiar with the FCC's 2006 order governing the appropriate regulatory treatment for prepaid calling card services. *In re Regulation of Prepaid Calling Card Services*, 21 FCC Rcd. 7290 (2006) ("*Comprehensive Calling Card Order*"). The FCC's ruling is one of the pillars of this Court's order in the IDT case. The dispositive FCC holding appears in paragraph 10 of the FCC's order, which squarely states that "*all* prepaid calling card providers will now be treated as telecommunications service providers." *Id.* ¶ 10.[1] This Court correctly acknowledged the FCC's holding that "all prepaid calling card providers would be treated as telecommunications service providers." *IDT Summary Judgment Order*, at 9; Pl. Appx. 176.

The Court also appreciated – and found it "important to note" – that the FCC's order clearly spells out the consequences of that holding. Once a given prepaid calling card service is deemed to be a telecommunications service, the providers of that service are "subject to all of the applicable requirements of the Communications Act and the Commission's rules, including requirements to contribute to the federal USF *and to pay access charges*." *Comprehensive Calling Card Order*, ¶ 21. This Court's *IDT Summary Judgment Order* (Pl. Appx. 177-78) cogently applies the FCC's key holdings to this case:

> [T]he 2006 Order provides courts with interim rules applicable to "all prepaid calling card providers." Thus, it is clear that until the FCC provides further guidance, all prepaid calling card providers are to be treated as telecommunications service providers and therefore, they are responsible for access charges as detailed in the 2006 Order. Accordingly, prepaid calling card providers who utilize LANs, such as Defendants, are responsible for access charges.

---

[1]  All emphases in quoted material have been added by the AT&T LECs unless otherwise stated.

Judge O'Connor of this District read the same FCC order and reached the same conclusion in the similar case involving Next-G. Pl. Appx. 163. Touch-Tel does not dispute, or even address, the critical elements of either Court's analysis. In fact, Touch-Tel agrees (at 15) that paragraph 10 of the FCC's order "held that '***all*** prepaid calling card providers will now be treated as telecommunications service providers" – one of the linchpins of this Court's ruling. Unable to touch the Court's reasoning, Touch-Tel embarks on a series of baseless diversions.

### 1. The FCC's Order Went Beyond The Two Specific Services Mentioned In The First Three Sentences Of Paragraph 1.

After accusing the AT&T LECs (and in effect this Court and Judge O'Connor) of relying on "selectively quoted language from the [2006] Order" (Def. Br. 2), Touch-Tel's brief resorts to a selective quotation from paragraph 1 of that Order. Touch-Tel (at 23) takes in isolation the FCC's statement that "we will treat certain prepaid calling card service providers as telecommunications service providers" and claims that "'[c]ertain' just cannot be dilated into 'all.'"  But the FCC's order contains 78 paragraphs, not just one. As this Court has correctly observed, the Order "initially dealt with" two prepaid calling cards, but "then went further and set forth rules applicable to all prepaid calling card providers." *IDT Summary Judgment Order*, at 8, 9; Pl. Appx. 175, 176. And as the Court also recognized, the FCC's order explains *why* the FCC went from "certain" to "all": so that all providers would operate on the same level playing field and would not be encouraged to "reduce exposure to charges they may owe or evade them altogether." *Id*. at 9; Pl. Appx. 176 (citing *Comprehensive Calling Card Order*, ¶ 8).

To redouble the point, paragraph 68 of the FCC's order – which Touch-Tel's brief ignores – neatly wraps up the FCC's progression from "certain" to "all":

> In this *Order*, the Commission finds that ***certain*** types of prepaid calling card providers are telecommunications carriers and therefore subject to ***applicable requirements*** of the Communications Act and the Commission's rules, ***including the obligation to pay access charges*** and contribute to the Universal Service Fund. We apply these existing rules for the purpose of preserving and advancing

universal service and providing regulatory certainty....After reviewing the record, *we conclude that the best way to meet our goals* of preserving and advancing universal service and providing certainty to the prepaid calling card market *is to subject all prepaid calling card providers to the same requirements*.

The FCC's comprehensive resolution was no accident or surprise. The FCC announced at the outset of the proceeding that it would *not* address "certain" prepaid offerings alone, but "all" of them. The FCC declined to address "calling cards in a piecemeal manner" and instead sought "a more comprehensive" resolution governing "*all* types of current and planned calling card services." *In re AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services*, 20 FCC Rcd. 4826, ¶ 38 (2005) ("*2005 Calling Card Order*").

Thus, Touch-Tel is attempting to take rules the FCC plainly extended and expressly intended for "all" providers, and deflate them into rules for "certain" providers by lifting three sentences from the first paragraph of the FCC's 78-paragraph order. It is Touch-Tel's reading, not the Court's, that is "doing violence to the words the FCC actually used." Def. Br. 23.

### 2. Touch-Tel Reads Paragraph 27 Of The FCC's Order Out Of Context.

Equally selective, and equally irrelevant, is Touch-Tel's argument about paragraph 27 of the FCC's order. Def. Br. 26. That paragraph notes that some parties (including IDT) "questioned the logistics of *requiring all prepaid calling card service providers to pay intrastate and interstate access charges.*" *Comprehensive Calling Card Order*, ¶ 27. The FCC then resolved those questions – not by making exceptions for any flavor of prepaid service, but by establishing reporting requirements that apply to all providers. See *id*. ¶¶ 29-31, 38-41, 47. Touch-Tel reads paragraph 27 in isolation, arguing that it states a question raised by parties rather than an FCC holding. But Touch-Tel is missing three critical points.

**First,** *why* did IDT and the other parties to the FCC proceeding "question[] the logistics of requiring all prepaid calling card service providers to pay intrastate and interstate access

6

charges"? Because they understood the FCC was considering just such a broad requirement. Before the FCC issued its order, one party petitioned the FCC to "subject[] *all* prepaid calling card service providers to the same types of access charges," and one of its proposals was that "the Commission rule that *all* prepaid calling card service providers are subject to both intrastate and interstate access charges." *Comprehensive Calling Card Order*, ¶ 6.

      **Second,** why did the FCC address "the logistics of requiring all prepaid calling card service providers to pay intrastate and interstate access charges"? If the access charge holdings of its order were truly limited to two specific calling card services, the way that Touch-Tel contends, there would have been no need to consider logistics for *all* services, and the FCC's discussion would have been superfluous. The only reason to even think about the logistics of "requiring all prepaid calling card service providers to pay intrastate and interstate access charges" is if the FCC had decided to require exactly that – as it did in paragraph 10.

      **Third,** how did the FCC resolve the question about logistics? It did not create an exception for any card services: not only does no exception appear anywhere in the order, but the FCC stated that any exceptions would be contrary to the public interest. *Comprehensive Calling Card Order*, ¶¶ 8-9. And the FCC certainly did not create an exception for cards that use "local" access numbers. Instead, the FCC addressed logistics by establishing certification and reporting requirements that apply to all card providers. *Id.* ¶ 1 ("[W]e require *all* prepaid calling card providers to comply with certain reporting and certification requirements."); *id*. ¶ 38 ("*[E]very* prepaid calling card provider must submit a certification"). Yet the purpose of the reporting rules is to "ensure compliance with [the FCC's] existing access charge rules." *Id*. ¶ 31. Thus, the only reason for the reporting requirements to apply to all prepaid calling card providers, including those that use LANs – as Touch-Tel concedes to be the case (Def. Br. 15) – is if the underlying "access charge rules" *also* apply to "all" prepaid card providers. Read in context, then, paragraph

27 of the FCC's order is a succinct confirmation that the order is indeed one "requiring *all* prepaid calling card service providers to pay intrastate and interstate access charges."

**3.      Touch-Tel Cannot Use "Industry Standards" To Overturn This Court's Ruling Or The FCC's Order.**

Unable to overcome the plain language of the FCC's order, or this Court's correct construction of that order, Touch-Tel resorts to a misapplication of industry standards. Touch-Tel claims (at 27) that "Plaintiffs may not overturn industry standards" under which calls are charged based on the telephone numbers of the calling and called parties. The first problem with Touch-Tel's argument is that its real beef is not with "Plaintiffs" but with the FCC and this Court. The controlling "industry standard" is the order issued by the industry's regulator (the FCC), and the Court has correctly enforced that order.

In any event, Touch-Tel's "industry standards" simply reinforce the FCC's order and the Court's ruling. There is no dispute that the calling and called parties for virtually all the calls at issue have phone numbers in different countries, so the calls should be treated as long-distance calls. If Touch-Tel is suggesting the "called party" is the card provider's platform (in between the calling and called parties), the FCC has rejected that theory. *2005 Calling Card Order*, ¶ 23 ("[T]he Commission has never found this communication [with the platform] to be relevant"); see also *id*. ¶ 26 ("[T]he only relevant communication … is from the calling card caller to the called party"). Likewise, this Court has correctly recognized that a LAN arrangement, which conceals the phone number of the called party from the AT&T LECs and makes "long-distance calls placed by Defendant's customers appear local," does not allow the long-distance provider to evade access charges. *IDT Summary Judgment Order*, at 11; Pl. Appx. 178.

Touch-Tel's reliance on *WorldCom v. FCC*, 288 F.3d 429 (D.C. Cir. 2002) (Def. Br. 20-21) and *Starpower Commc'ns v. Verizon South*, 18 FCC Rcd. 23625 (2003) (Def. Br. 28) is equally unfounded. Those cases did not deal with long-distance voice calls, but with dial-up data

8

traffic delivered to Internet service providers ("ISPs"). Unlike long-distance phone calls, ISP traffic is not subject to access charges, because ISPs are expressly exempt from such charges. *Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 523, 541 (8th Cir. 1998). Touch-Tel is not an Internet service provider, but an IXC. The FCC has held the conventions for billing Internet traffic are inapplicable to the calling card context presented here, because a calling card service "is not analogous to ISP-bound traffic." *2005 Calling Card Order*, ¶ 26.

### B.    The Telecommunications Act Of 1996 Did Not Destroy, But Instead Preserved, Access Charges On The Long-Distance Calls At Issue Here.

To avoid the FCC's order and this Court's ruling, Touch-Tel turns to the federal Telecommunications Act of 1996. Touch-Tel claims that its service is subject to "reciprocal compensation" under section 251(b)(5) of the Act, rather than access charges. Touch-Tel's arguments about the Act are irrelevant, given this Court's correct conclusion that the FCC ordered "all" prepaid calling card service providers to pay access charges. At most, Touch-Tel is saying the FCC was wrong, but this Court has no jurisdiction to hear appeals from FCC orders.

In any event, Touch-Tel's diversion goes nowhere because this Court has correctly held that "reciprocal compensation does not govern the traffic at issue and the traffic is subject to access charges" under section 251(g) of the 1996 Act. *IDT Summary Judgment Order*, at 12; Pl. Appx. 179. Section 251(g) preserves the AT&T LECs' right to assess access charges, by providing that "[o]n and after the date of enactment of the Telecommunications Act of 1996, each local exchange carrier ... shall provide *exchange access*" under the same terms – "including receipt of compensation" – that "apply to such carrier" before the Act. 47 U.S.C. § 251(g).

The service provided by the AT&T LECs here falls squarely within the "exchange access" protected by section 251(g). The Act defines "exchange access" as "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." *Id.* § 153(20). "Telephone toll service," in turn, is

"telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service" *Id*. § 153(55). There is no dispute that Touch-Tel's long-distance calling cards provide "telephone service between stations in different exchange areas" (almost always in different *countries*) and there is no dispute that Touch-Tel assesses a "separate charge" for those calls that is not included in the end user's bills for local service (by making its end users buy calling cards, and then deducting money from the cards when the end users make long-distance calls). The Court has properly held that "[g]iven the nature of the traffic, the fact that it is originating with Plaintiffs and terminating in a different exchange area," and the fact "that retail end users are using a prepaid calling card to make the traffic (indicating that the coverage is not covered by their contracts with Plaintiffs), § 251(g) applies." *IDT Summary Judgment Order*, at 12; Pl. Appx. 179.[2]

Touch-Tel claims the access service is different here, but the asserted distinctions (which this Court has heard and rejected in the IDT case) make no difference. **First**, Touch-Tel asserts that the AT&T LECs are delivering the calls to Touch-Tel's platform indirectly (by delivering them to Touch-Tel's's intermediate carrier, the CLEC, which in turn takes them to Touch-Tel), rather than taking them all the way to Touch-Tel directly. That is irrelevant. Long before the 1996 Act, the FCC stated its "clear intent" that the access charge regime "would include the costs of interstate access arising from the use of EAS [extended area service] facilities, *whether in a single carrier environment or in a multicarrier arrangement*." *In re Amendment of Part 69 of the Commission's Rules to Ensure Application of Access Charges to All Interstate Toll Traffic*,

---

[2] Touch-Tel also claims (at 20-21) that it is not an interexchange carrier. That is absurd. Touch-Tel does not dispute that it is a common carrier, and the calls it carries are almost all "interexchange" calls (in fact, over 95 percent are international calls). No one would call Touch-Tel a "local exchange" carrier, and Touch-Tel certainly has made no showing that it is. The FCC's statement that prepaid calling cards allow consumers to place long-distance calls without *presubscribing* to an interexchange carrier (Def. Br. 21) simply means that customers pay for Touch-Tel's interexchange service in a different way, not that the service itself is any different.

102 FCC 2d 1243, ¶ 12 (1985). In fact, the "multicarrier arrangement" in that order was one in which end users "access[ed] an interexchange carrier's network toll free by calling its seven-digit access number" (¶ 1 n.1) so the originating LEC could not tell whether the call "[wa]s actually [a local] call or whether it [wa]s a toll call" (*id.* ¶ 3) – the same as Touch-Tel's arrangement here.[3]

**Second**, Touch-Tel claims that its arrangement is new (and thus not subject to the preservation of access charges under section 251(g)) because the intermediate carrier is a CLEC, and CLECs did not exist before the 1996 Act. But if Touch-Tel's view was correct, then CLECs could never assess access charges for transporting any long-distance calls; moreover, long-distance carriers (even familiar brand names like Sprint) could have wiped out the access charge regime by funneling their traffic through CLECs. No court or agency has ever adopted Touch-Tel's extreme position. To the contrary, the FCC has ruled that the incumbent and CLEC alike may charge for the access services they provide. *In re Access Charge Reform: Reform of Access Charges Imposed by Competitive Local Exchange Carriers*, 19 FCC Rcd. 9108, ¶¶ 10-16 (2004). Moreover, the FCC has held that an incumbent LEC is entitled to "assess any charges for its access services upon the relevant IXC" when the incumbent and a CLEC jointly deliver long-distance calls to that IXC. *In re Petition of WorldCom, Inc.*, 17 FCC Rcd. 27039, ¶ 177 (2002).

Further, this Court has correctly held that all of Touch-Tel's purported distinctions suffer from a common and fatal flaw. Like IDT, Touch-Tel is "looking at the traffic in parts, instead of analyzing the traffic as a whole." *IDT Summary Judgment Order*, at 11; Pl. Appx. 178. This case

---

[3]   The same FCC order held that the originating carrier in a multicarrier arrangement (like the AT&T LECs here) is entitled to access charges for the service it provides in transporting traffic from the end user to the IXC's middleman, even though the downstream transportation service from the middleman to the IXC was called a "business line" rather than a tariffed access service. *Id.* ¶ 27. Thus, it is fruitless for Touch-Tel to assert that it buys the CLEC leg of the access service here as a business line, rather than from a CLEC access tariff. Def. Br. 22 & n.9. Whatever arrangements the CLEC and Touch-Tel make for transporting calls from the CLEC to Touch-Tel's platform, Touch-Tel cannot evade payment for the originating access service the AT&T LECs provide in getting calls to the CLEC in the first place.

does not involve the mere "exchange of traffic between CLECs and ILECs"; rather, Touch-Tel's service "allow[s] customers to make long-distance or international phone calls." *Id.* "Plaintiffs are originating long-distance phone calls without receiving the access charges to which they are entitled" and Touch-Tel cannot evade those charges "simply because a third party [CLEC] is placed in the middle of the calling card traffic." *Id.* at 11, 12; Pl. Appx. 178, 179.

### C.   As The Court Held In The IDT Case, Touch-Tel Has Also Violated The AT&T LECs' Binding Federal Tariffs.

#### 1.   Contrary To Touch-Tel's Assertion, The Court Did Analyze The Relevant Tariffs In The IDT Case.

Touch-Tel asserts (at 32) that the Court "fail[ed] to analyze the terms" of the AT&T LECs' tariffs in the IDT case. Obviously, that is wrong. The Court received extensive briefing from both sides on cross-motions for summary judgment, with three briefs from each side addressing the tariffs. The Court's opinion recognizes that a tariff inquiry "must be made," states that the Court reviewed the arguments from both sides, and does what countless court opinions have done: "disagrees" with the arguments of one side (IDT) and finds in favor of the other (the AT&T LECs). *IDT Summary Judgment Order*, at 14-15; Pl. Appx. 181-82. Thus, Touch-Tel is not disputing the Court's substantive analysis but the Court's opinion-writing. However, if the Court's time-honored approach was really "legal error" (Def. Br. 32), then numerous trial court and circuit court decisions would have been reversed for doing the same thing. Touch-Tel cannot cite even one.[4] The Court was not required to repeat in its opinion the analysis contained in the prevailing parties' briefs; in fact, it was not required to issue a written opinion at all, and could

---

[4]   Touch-Tel's arguments about opinion-writing find no support in its citation to *3 Rivers Tel. Co-op v. US West Communications, Inc.*, 45 Fed. Appx. 698 (9th Cir. 2002).  In *3 Rivers*, the district court did not reach any conclusion about the applicable tariffs and in fact asserted the tariffs were irrelevant. *Id.* at 699.  Touch-Tel's other citations (Def. Br. 30-31 & n.14) have nothing to do with opinion-writing either; they deal simply with the requirement that tariffs describe the service provided, an issue this Court fully recognized and decided in favor of the AT&T LECs. *IDT Summary Judgment Order*, at 14-15; Pl. Appx. 181-82.

simply have said that the AT&T LECs' partial summary judgment motion was granted. *See Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 873 n.1 (5th Cir. 1999) ("[D]istrict court judges are not required to specify a reason for a grant of summary judgment.").

Touch-Tel (at 30) appears to take issue with the Court's phrasing "it appears that one, if not more, of Plaintiffs' tariffs apply to the traffic in issue." But there was no need for the Court to cite chapter and verse of all six federal and all 22 state access tariffs, which are publicly available and known by both sides. As in this case, both sides in the IDT case focused on the federal tariff of Southwestern Bell as the leading example; however, the AT&T LECs provided a detailed chart showing the other tariffs are the same in all material respects, and neither IDT (nor Touch-Tel) has claimed that any other Plaintiff's tariff has any substantive difference in terms.

### 2.    Touch-Tel Has Obtained – But Not Paid For – Originating "Switched Access Service" As Defined By The AT&T LECs' Tariffs.

There is no basis for Touch-Tel's assertion (at 28) that "Plaintiffs never articulate what service they are providing in their tariffs." Touch-Tel could not have missed the AT&T LECs' demonstration (Pl. Br. 17-19) that the service they are providing is originating "Switched Access Service," which appears in section 6.1 of Southwestern Bell's federal tariff. Pl. Appx. 68 § 6.1.[5] That service "provides a two-point communications path between a customer's premises and an end user's premises" through the AT&T LECs' network "plant" that "provides for the ability to originate calls from an end user's premises to a customer's premises." *Id*. The access "customer" is "any" entity "which subscribes to the services offered under this tariff, including ... Interexchange Carriers." Pl. Appx. 63.[6] An "end user" is "any customer of an interstate or

---

[5]    Similar language appears in the other AT&T LEC tariffs; for a chart summarizing the applicable tariff provisions for each Plaintiff, see Pl. Appx. 44-57.

[6]    As the AT&T LECs showed in their opening brief, and confirm in Section I.D below, Touch-Tel constructively "subscribe[d]" to the tariffed services.

foreign telecommunications service that is not a carrier" – in other words, the retail customer who buys long-distance phone service from the IXC. Pl. Reply Appx. 5. For the calls here, the access "customer" is Touch-Tel (the interexchange carrier) and the "end user" is the retail customer making a long-distance call with a Touch-Tel card.

Indisputably, for each call Touch-Tel obtained "a two-point communications path" from its retail end user, through the AT&T LECs' "plant," to Touch-Tel's "premises" so Touch-Tel could send that call on to its long-distance destination. An AT&T LEC originated each call and took it from the end user to Touch-Tel's CLEC middleman. From the perspective of the AT&T LECs, the CLEC's network is the "premises" of Touch-Tel, the access customer: Touch-Tel has made that the place where the AT&T LECs are to deliver Touch-Tel's calls, and it has given the CLEC a contractual duty to take the calls from there to Touch-Tel's platform. Even if one considers Touch-Tel's "premises" to be the Touch-Tel platform, Touch-Tel has still received a communications path from the end user to that platform. An indispensable part of that path – the starting leg that begins where the end user makes the call – comes from the applicable AT&T LEC (the remainder comes from Touch-Tel's CLEC).

Either way, because of the AT&T LECs, Touch-Tel obtained "the ability to originate calls from [each] end user's premises" to its platform. Conversely, without the path provided by the AT&T LECs, Touch-Tel would not have received any calls originating from the many end-user "premises" on the AT&T LECs' networks. Yet Touch-Tel has not paid the AT&T LECs anything for the service they provide.

None of Touch-Tel's responses have any merit. **First,** Touch-Tel tries to ignore section 6.1, saying (at 33) that it "describe[s] every type of call that leaves AT&T's network." Touch-Tel asserts that the access tariffs would then apply to local calls and wipe out the reciprocal compensation regime. Touch-Tel is attacking a straw man. As the AT&T LECs showed in their

14

opening brief, the federal access tariff is limited to "Access Minutes," which are based on the "usage of exchange facilities in *interstate or foreign* service." Pl. Appx. 62 § 2.7. No one contends that section 6.1 applies to local calls, but no one contends that Touch-Tel's calls (almost all of which go outside the country) are local. To be sure, section 6.1 does broadly apply to all interstate and international calls that originate or terminate on the AT&T LECs' networks, but that is consistent with the FCC's equally broad rules. Those rules make clear that interstate "[a]ccess service" includes "services and facilities provided for the origination or termination of *any* interstate or foreign telecommunication" (47 C.F.R. § 69.2(b)) and that access charges shall be assessed on "*all* interexchange carriers that use local exchange switching facilities for the provision of interstate or foreign telecommunications services" (*id*. § 69.5(b)).

**Second**, Touch-Tel (at 33-34) misreads section 6.1. Touch-Tel says that section only allows access charges when the AT&T LEC provides *all* communications services and facilities, all the way from the end user to Touch-Tel's platform. But section 6.1 does not say that. Rather, section 6.1 simply requires a "communications path" between the end user and the access customer that is provided "through" the "plant of the Telephone Company [the AT&T LEC]" – without saying whether the path must be provided *wholly* through the AT&T LECs' "plant" or *partly* through the AT&T LECs' plant.

Thus, section 6.1 does not preclude the AT&T LEC from collecting access charges when it and another local carrier "jointly" provide the communications path. Nor would one expect such a bar, because the AT&T LECs' right to collect access charges in that situation was established long ago by the FCC. Section 2.6 of the tariff ("Jointly Provided Access Services") implements that federal right, and it makes clear that section 6.1 does apply to the specific situation where the path is provided jointly by the AT&T LEC and a second local carrier. Conversely, if section 6.1 precluded access charges when the AT&T LEC provided part of the

path connecting the IXC to its end user, the way Touch-Tel contends, then it would nullify the discussion of jointly provided access under section 2.6.

Section 2.6 states that "Jointly Provided Access Service has one end of the service in one exchange telephone company operating territory and the other end of the service in another exchange telephone company operating territory." Pl. Appx. 59. That is what has happened here. "One end" of the communications path between the end user and the Touch-Tel platform (the part that starts at the end user) is in the operating territory of "one exchange telephone company" – the AT&T LEC. "[T]he other end of the service" is in the operating territory of "another exchange telephone company" – the CLEC. Thus, section 2.6.3 allows "each exchange telephone company providing service to bill the customer for its portion of a jointly provided access service according to its Access Service Tariff charges." Pl. Appx. 61.

Touch-Tel says (at 35) that the two LEC's territories have to be different – but they *are* different, so Touch-Tel goes nowhere there. The operating territories of incumbent phone companies like the AT&T LECs were set long ago by state franchise regulations. By contrast, CLECs choose their own territories based on their own business plans, without regard to the old regulatory boundaries. Nothing requires them to serve the *entire* territory of any incumbent, and nothing precludes them from operating beyond that incumbent's territory. See *In re Access Charge Reform*, ¶¶ 46, 48 (CLEC service areas can comprise "different incumbent LEC territories" served by "more than one incumbent LEC").[7]

Finally, Touch-Tel mischaracterizes the report of the AT&T LECs' damages expert, Dr. Aron. According to Touch-Tel (at 35), her report ████████████████████████████

---

[7]   A given CLEC's territory may overlap the AT&T LEC's territory in some places, but nothing in section 2.6 prohibits overlapping territories. Nor would such a prohibition make sense. The tariffs implement federal regulations, and as described in Section I.B above, the FCC has held both carriers that jointly take calls to an IXC may collect access charges, even when (i) the two local phone companies serve the same calling area and (ii) one of the local carriers is a CLEC.

████████████ That is not true. Dr. Aron's report plainly states that ████████

████████████████████████████████████████████████████████ Def. Appx.

212. While she acknowledges that Touch-Tel ██████████████████ because it did not

order access or jointly provided access (*id*.), that does not mean that Touch-Tel can take the

tariffed service without ordering or paying for it.

### 3.   As In The IDT Case, The Court Should Reject Touch-Tel's Baseless "Feature Group" Argument.

To avoid the governing tariff provisions, Touch-Tel tries changing the subject to "Feature

Groups." Like IDT before it, Touch-Tel asserts that the access service it obtained must precisely

match all the technical specifications for one of four feature groups (A, B, C, or D) or else

Touch-Tel gets off scot-free.

The Court "disagree[d]" with IDT's tariff arguments (*IDT Summary Judgment Order*, at

15; Pl. Appx. 182), and it should do the same here. Like IDT, Touch-Tel fails because it does not

cite a single authority that ever adopted, applied, or even considered its theory that a party must

show that its service fits a particular "Feature Group" to collect access charges. The only Touch-

Tel citations that actually addressed access tariffs support the AT&T LECs' application of the

law, not Touch-Tel's invented test. Rather than looking at Feature Groups, those cases applied

the straightforward test the AT&T LECs have applied (and satisfied) here: whether the local

carrier provided "Switched Access," a communications path between the end user and the access

customer that provides the ability to originate calls. *AT&T Corp. v. YMax Commc'ns Corp*., 26

FCC Rcd. 5742, ¶ 15 (2011); *MCI WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc.*,

2005 WL 2145499, at *4 (E.D. Va. Aug. 31, 2005); *Alliance Commc'ns Coop. v. Global

Crossing Telecommunc'ns, Inc.*, 690 F. Supp. 2d 889, 894 (D.S.D. 2010).

Touch-Tel's inability to find supporting authority is not surprising. Feature Groups are

simply shorthand descriptions of certain connection types and specifications ("groups" of

"features") that facilitate the ordering process. Feature Groups are not the actual *service* (which is described in section 6.1); they describe some connection arrangements the customer can order and the AT&T LEC can use in providing that service. This is confirmed by the tariff's pricing provisions, which do not contain prices for any "Feature Group"; rather, the actual rate elements used are priced *a la carte*. Pl. Appx. 37 (¶ 23) & 69-72. It is disingenuous for Touch-Tel to invoke Feature Groups, which were designed to facilitate the ordering process, as an argument to avoid payment for services Touch-Tel obtained *without* placing an order.

Touch-Tel's argument also fails on the facts. The service provided by the AT&T LECs here is functionally equivalent to Feature Group D, which is "[t]he most common Feature Group now." Def. Appx. 247. Feature Group D accommodates both (i) long-distance providers whose end users "presubscribe" to their service so they can dial long-distance numbers directly, and (ii) providers like Touch-Tel, whose end users reach them by dialing a 7-digit access code. *Id.*[8]

Out of all the technical specifications the tariff details for Feature Group D, the only distinction Touch-Tel offers is that in their arrangement, end users dial a different access code to reach the long-distance provider. But there is no meaningful difference. With Feature Group D, end users dial a 7-digit access code. Pl. Reply Appx. 6 § 6.2.4(B)(2). Here, Touch-Tel's end users *also* dial a 7-digit access code: the "local access number" on their calling card. The only difference is that the code for Feature Group D is 101-XXXX, where "XXXX" identifies the long-distance provider. Thus, Touch-Tel's position reduces to the untenable assertion that it can force the AT&T LECs to provide the equivalent of a Feature Group D arrangement *for free*, just

---

[8]    Touch-Tel wrongly suggests (at 27) that Feature Group D requires the end user to "presubscribe" his or her phone to the long-distance provider in advance. In fact, the tariff lists the seven-digit access number as the default first choice. Pl. Reply Appx. 6 § 6.2.4(B)(2). Presubcription is an option that allows the end user to make long-distance calls without dialing the seven-digit access code first. Pl. Reply Appx. 7 § 6.2.4(B)(4). As things have turned out, presubscription is the option with which end users are most familiar, but it is certainly not the requirement Touch-Tel makes it out to be.

18

because Touch-Tel discovered a 7-digit code that made the AT&T LECs provide an equivalent arrangement without knowing it. Touch-Tel cites no support for that position. What matters is the service that the AT&T LECs provide (the communications path that allows Touch-Tel to receive calls originating on the AT&T LECs' networks) not the specific code the end user dials to obtain that service.

> **D.     There Is No Genuine Dispute That Touch-Tel Has Constructively Ordered Access Services From The AT&T LECs.**

As in the IDT case, Touch-Tel's objections that it did not order access service from the AT&T LECs are fruitless. Applying settled law, this Court held that IDT constructively ordered access service. *IDT Summary Judgment Order*, at 15-17; Pl. Appx. 182-84. The AT&T LECs have shown that the same conclusion applies to Touch-Tel, and Touch-Tel offers no real dispute. Instead, like IDT, Touch-Tel tries to get off on technicalities, none of which has any merit.

**First,** Touch-Tel argues (at 37-38) that it is interconnected with the AT&T LECs *indirectly* (through its CLEC middlemen) rather than directly. But this Court has correctly recognized that the indirect connection makes no difference. "Courts have found the constructive ordering doctrine to be applicable to an interexchange carrier even when the interexchange carrier is not directly connected to the LEC." *IDT Summary Judgment Order*, at 16 (citing cases); Pl. Appx. 183. Indeed, the FCC *announced* the doctrine in an indirect-connection case. See *United Artists Payphone Corp. v. New York Tel. Co.*, 8 FCC Rcd. 5563 (1993). There, the defendant was "connected to the public network" and ultimately to the plaintiff long-distance carrier indirectly, "by public access lines purchased from" the local phone company New York Telephone (which played the middleman role that Touch-Tel's CLECs are playing here). *Id.* ¶ 2.

Touch-Tel tries (at 38) to support its theory by transplanting language from an FCC order defining the "interconnection" requirements of the Telecommunications Act of 1996. That order describes "interconnection" as a physical link between networks. However, the FCC did not say

19

that the physical link must be direct. Indeed, the 1996 Act says that carriers have the duty "to interconnect directly *or indirectly*" with each other. 47 U.S.C. § 251(a)(1). Moreover, orders addressing the connections between local carriers under the 1996 Act do not address the constructive ordering doctrine, nor do they address access services.

**Second,** Touch-Tel claims (at 39) that the long-distance provider must "designate" a point where calls are to be received, but it has effectively done so here. Touch-Tel is a retail long-distance provider and its "local" access numbers designate where its traffic is to go. When a Touch-Tel end user dials one of those LANs from an AT&T LEC phone line, that instructs the AT&T LEC to deliver the call to Touch-Tel's CLEC middleman, and instructs the CLEC to take the call to Touch-Tel's platform. Touch-Tel's arrangement concealed the call's *ultimate* destination from the AT&T LECs, but that is hardly a reason for Touch-Tel to escape liability.[9]

**Third,** Touch-Tel claims (at 39-40) that it took steps to prevent the receipt of services from the AT&T LECs by ordering services from CLECs. But Touch-Tel has not obtained its access *solely* from CLECs. For the calls at issue here, Touch-Tel's CLECs are simply middlemen that handle *part* of the journey: from their connection with the applicable AT&T LEC, to Touch-Tel's platform. The transportation service for the essential opening leg of the journey – from the end user who makes a call with a Touch-Tel card, to Touch-Tel's CLEC – is provided by the AT&T LECs. Touch-Tel has taken no steps at all to prevent the AT&T LECs from performing that service. In fact, Touch-Tel has taken steps to *ensure* that the AT&T LECs continue to originate and carry Touch-Tel calls, by issuing "local access" cards to the public (including

---

[9]   As this Court has already held, Touch-Tel's citation to *Alliance Communications Coop. v. Global Crossing Telecommunications, Inc.*, 663 F. Supp. 2d 807 (D.S.D. 2010) is inapposite because "the facts in *Alliance* are distinct from this case." *IDT Summary Judgment Order*, at 16; Pl. Appx. 183. In *Alliance*, the local exchange carriers did not sue the retail IXC that sold long-distance service to end users (which was called "Express"); instead, they sued wholesale suppliers that had provided transmission services for pieces of each call to the retail IXC. Here, the AT&T LECs are suing the retail IXC – Touch-Tel – which has used LANs to designate the "premises" where its calls are to be delivered.

persons who buy local phone service from an AT&T LEC). Pl. Br. 20-21. In the IDT case, this Court confronted the same argument and rightly held that IDT "did not take reasonable and affirmative steps to prevent receipt of the [AT&T LECs'] services" but "simply added an additional step by purchasing LAN services from CLECs in order to avoid access fees." *IDT Summary Judgment Order*, at 16; Pl. Appx. 183. The same conclusion applies here.

## II.     The Court Should Disregard Touch-Tel's Untimely And Baseless Attempts To Seek Summary Judgment On Damages Issues.

Sections II.C and II.D of Touch-Tel's response brief do not respond to the AT&T LECs' motion. The AT&T LECs seek partial summary judgment on liability, and expressly left the issue of damages for trial. Touch-Tel now seeks to limit damages, but that is not a proper response, as it has nothing to do with the issue of liability and does not respond to any argument in the AT&T LECs' brief. Essentially, Touch-Tel is trying to *support* summary judgment for itself on *damages*, rather than to *oppose* summary judgment for the AT&T LECs on liability. But the Court's deadline for dispositive motions was April 9, 2012, and Touch-Tel's arguments arrived four weeks too late. In any event, Touch-Tel's arguments lack merit.

### A.     The AT&T LECs Are Entitled To Collect Damages From January 2007 Through August 2008.

The AT&T LECs filed this suit in August 2010. They seek damages for access charges evaded by Touch-Tel going back to January 2007. The statute of limitations allows carriers to sue for "recovery of their lawful charges ... within two years from the time the cause of action accrues." 47 U.S.C. § 415(a). As Touch-Tel admits (at 40), a cause of action does not "accrue" until the plaintiff "discovers or with due diligence should have discovered the injury that is the basis of the action." Touch-Tel states the AT&T LECs knew about Touch-Tel by October 2009, and they filed suit less than a year after that. That is much sooner than the two years allowed by law, so Touch-Tel goes nowhere complaining that the AT&T LECs "waited to initiate a lawsuit

until August 21, 2010." Surely Touch-Tel cannot be saying the AT&T LECs had to file suit *immediately*, without even giving Touch-Tel notice or a chance to resolve the matter voluntarily.

Touch-Tel fares no better with its conclusory assertion (at 41) that, right after the FCC issued its 2006 order, the AT&T LECs should have figured out that Touch-Tel was violating the order. The question of when a plaintiff should have known about an injury is typically a factual question. *See Beattie v. CenturyTel, Inc.*, 673 F. Supp. 2d 553, 559-60 (E.D. Mich. 2009). Touch-Tel's practice here, by its nature, disguised long-distance calls so the AT&T LECs did not know that the calls were going to Touch-Tel's platform, or that access charges were due, or that Touch-Tel was the one avoiding those charges. As this Court has held, "[a] fact issue remains as to when Plaintiffs knew or should have known about the traffic at issue." *IDT Summary Judgment Order*, at 17; Pl. Appx. 184.

**B.     To Be Made Whole, The AT&T LECs Are Entitled To Receive Interest For The Time Touch-Tel Deprived Them Of Their Tariffed Access Charges.**

Touch-Tel has evaded the AT&T LECs' access charges for over five years. It is well established that a carrier in the AT&T LECs' position is entitled to an award of interest over and above the tariffed charges. The Fifth Circuit has long recognized that "the only way the wronged party can be made whole is to award him interest from the time he should have received the money." *Louisiana & A. Ry. v. Export Drum Co.*, 359 F.2d 311, 317 (5th Cir. 1966) (awarding interest to railroad that sued shipper for underpayment of tariffed shipping charges). Indeed, "interest from the time the money is due ... is a *mandatory* element of the damages." *Id.*

Touch-Tel nonetheless asks the Court to bar the claim for interest, arguing that the tariffs require the AT&T LECs to submit bills before they can assess late payment charges. This Court did not accept this argument when IDT made it, and should not accept Touch-Tel's recycled version. **First**, *before* billing comes into play, the tariffs required Touch-Tel to submit orders and "provide all information necessary for the Telephone Company [the AT&T LEC] to provide and

22

bill for the requested service." Pl. Appx. 66 § 5.2.1(C). Instead, Touch-Tel disguised its long-distance traffic to look like local calls. **Second**, any bills would have been futile. Touch-Tel's position is that it does not owe the AT&T LECs anything for any calls.

More fundamentally, Touch-Tel is missing the point. The AT&T LECs are not seeking to collect the tariffed charges for *late* payment of bills. Rather, they seek damages for a much larger violation: Touch-Tel violated virtually all of the tariffs' substantive provisions by obtaining service without placing orders and without paying a penny, *ever*. If the Court allows Touch-Tel to pay the access charges now *without* interest, Touch-Tel will have received access services on "credit" for five years interest-free. No tariff violator is entitled to such a windfall.

## III. The AT&T LECs Are Entitled To An Injunction Enforcing Their Tariffs And The FCC's Orders And Rules.

In the *IDT Summary Judgment Order* (at 17), the Court properly held that "Plaintiffs are entitled to an injunction" enforcing the FCC's rules and the Court's order, and pledged to enter an injunction at the conclusion of trial. Pl. Appx. 184. It should do the same here. Touch-Tel has evaded federal law for over five years. It should obey federal law and this Court's orders.

Most of Touch-Tel's objections to the injunction are just retreads of its arguments about the merits, all of which the Court heard and rejected in the IDT case. Touch-Tel's other arguments have also been heard and rejected before.

**First,** it takes a lot of chutzpah for Touch-Tel to call itself "the good guy," given its long-running violation of federal law, particularly when Touch-Tel ████████ that the FCC's order applied to its LAN service. It is even worse for Touch-Tel to try patting itself on the back for providing cheap service to "low-income customers." Def. Br. 45. The FCC has held that Touch-Tel victimized those low-income customers with misleading ads (which Touch-Tel "target[ed]" to "immigrants") and hidden fees. *Touch-Tel Forfeiture Order I*, ¶ 1.

In any event, Touch-Tel's arguments are irrelevant. The FCC is fully aware that low income users buy calling cards (*2005 Calling Card Order*, ¶ 10), but has decided that the companies who sell those cards must pay the access charges required by law. After all, access charges were created so that local carriers like the AT&T LECs could "keep residential rates low." *In re Connect America Fund*, 26 FCC Rcd. 4554, ¶ 48 (Notice of Proposed Rulemaking, rel. Feb. 9, 2011). Thus, access charges also help low-income consumers (those who buy Touch-Tel's cards *and* those who do not).

**Second**, there is no basis for Touch-Tel (at 8) to accuse the AT&T LECs of "greed" for seeking to enforce federal law, particularly after this Court has agreed with the AT&T LECs' reading of federal law. With no analysis or evidence, Touch-Tel asserts (at 16) that the AT&T LECs have already been compensated for their services through rates charged to end users. But as Touch-Tel itself admits (at 7), the rates for local phone service only cover "the ability to place calls to other end users ... in the same local calling area" – not calls to other countries like the ones at issue here. By law, the AT&T LECs are entitled to assess access charges on "*all* interexchange carriers that use local exchange switching facilities for the provision of interstate or foreign telecommunications services." 47 C.F.R. § 69.5(b). These charges to carriers are in addition to the charges they assess on end users for local phone service. See *id.* § 69.5(a) (authorizing separate "subscriber line charge" on end users). If local service rates "compensated" local phone companies for access services, there would be no access charges or access tariffs for any long-distance calls, and the FCC would not have held that "all" card providers (like all other long-distance providers) must pay such charges.

**Third,** Touch-Tel complains (at 45) about the "hardships" it would face obeying the law, based on its conclusory assertion that its profit margins on calling cards are "razor thin." Touch-Tel offers no evidence to support that assertion (copied verbatim from IDT's briefs), and

certainly does not present any showing that compliance would present any serious financial hardship to an industry leader like Touch-Tel. Moreover, Touch-Tel offers no legal authority that allows any company to flout federal law simply to preserve its profit margins. "There is no cognizable harm to [a] defendant from being enjoined from doing something that is against the law and for which [it] has already been found liable." *Doctor's Associates, Inc. v. Subway.SY LLC*, 733 F. Supp. 2d 1083, 1087 (D. Minn. 2010).

## CONCLUSION

For the reasons set forth above and in their opening brief, the AT&T LECs respectfully ask the Court to grant their motion for partial summary judgment on liability and injunctive relief.

Dated:  May 21, 2012                          Respectfully submitted,

                                                         PLAINTIFFS

                                                         By:   /s/ Demetrios G. Metropoulos

Richard M. Parr, Bar No. 15534250       Theodore A. Livingston (*pro hac vice*)
Timothy A. Whitley, Bar No. 00797660    Demetrios G. Metropoulos (*pro hac vice*)
AT&T Services, Inc.                     Michael T. Sullivan (*pro hac vice*)
208 S. Akard                            Robert E. Entwisle (*pro hac vice*)
Suite 2900                              Mayer Brown LLP
Dallas, Texas 75202                     71 South Wacker Drive
Telephone (214) 757-3386                Chicago, Illinois 60606
Facsimile  (214) 748-1660               Telephone (312) 782-0600
                                        Facsimile (312)  701-7711

                                        *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on May 21, 2012, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court through ECF, which provides service on each party who is a registered ECF user.


<u>/s/    Robert E. Entwisle</u>